## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 21 2019, 5:49 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Valerie K. Boots
Ellen M. O'Connor
Marion County Public Defender Agency
– Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Anthony P. Buehner,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

February 21, 2019

Court of Appeals Case No.
18A-CR-1291

Appeal from the Marion Superior
Court

The Honorable Marc T.
Rothenberg, Judge

Trial Court Cause No.
49G02-1510-MR-35345

**Mathias, Judge.**

[1] Following a jury trial in Marion Superior Court, Anthony P. Buehner ("Buehner") was convicted of murder. Buehner appeals and argues that the trial

court erred in admitting evidence which he claims was irrelevant, unduly prejudicial, and inadmissible as prior bad acts.

We affirm.

## Facts and Procedural History

At the time relevant to this appeal, Buehner was in a romantic relationship with Janet Cook ("Janet") and lived with Janet in a home in Indianapolis. Buehner was very controlling, and Janet's formerly close relationship with her daughter, Jessica Cook ("Jessica"), began to change, with Janet having less and less contact with Jessica. Buehner was worried that Janet would rekindle her relationship with Jason Sanders ("Sanders"), who was the father of Janet's youngest son, J.J. Buehner made threats to physically harm Sanders and told people that J.J. was his son. Buehner also forbade Janet to have a telephone or a Facebook account. When Jessica came to visit her mother, Buehner always sat with Janet. And on one particular occasion, Janet would not even come out of her bedroom to speak with Jessica. Jessica saw Buehner grab her mother by the throat. And on one occasion, Buehner told Janet, in Jessica's presence, "[B]itch, I'll kill you!" Tr. Vol. II, p. 89. Buehner claimed he was not serious, but Jessica did not believe him. Approximately two weeks before her death, Janet moved out of the home she shared with Buehner and moved in with her sister. She later moved in with Jessica, who was recovering from surgery. Janet, however, still maintained her relationship with Buehner.

On September 27, 2015, Buehner sold prescription drugs to Marcia Tolliver ("Tolliver"), who informed Buehner that she and her boyfriend, Ashley Smiley ("Smiley"), had been fighting. Buehner informed Tolliver that he had a gun and could protect her. He also confided in her that he and his "girl" had also been having relationship troubles. *Id.* at 166. Tolliver could tell by the tone of Buehner's voice that he was very angry with his girlfriend. Later that day, Buehner spoke with Smiley, and the two discussed their relationship troubles. Buehner told Smiley that he wanted to kill his girlfriend, who he claimed had been unfaithful.[1] *Id.* at 176. Smiley also observed that Buehner had a handgun tucked into the back of his pants. Buehner then asked Tolliver if he could borrow her vehicle, a Jeep, ostensibly to go to the gas station. Tolliver agreed. But when Buehner did not return the following morning, Tolliver reported her Jeep as stolen to the police.

On October 1, 2015, Buehner showed up at Jessica's house to see Janet. He had brought J.J.'s bicycle with him. He also had a new mobile phone that he needed assistance setting up. Frustrated that Jessica did not know how to assist him with the phone, Buehner and Janet went to visit the people living in the other half of the duplex in which Jessica lived. This was the last time that Jessica saw her mother alive.

---

[1] On direct examination, Smiley testified that Buehner stated that "he wanted to kill her." *Id.* at 176. When asked who he meant by "her," Smiley replied, "Janet Cook." *Id.* However, on cross-examination, Smiley clarified that Buehner did not mention Janet by name when he stated that he wanted to kill his girlfriend. *Id.* at 183.

[6]     In the other half of the duplex, Buehner and Janet argued about the phone. Buehner told Janet that he would permit her to have a mobile phone, but not a smart phone. Buehner gave Janet some cash, which she put in her bra. When Buehner later asked Janet to return the cash, Janet refused. This apparently upset Buehner, who indicated that he was leaving. Janet said that she was going with him, to which Buehner replied, "[G]ood, bitch, if you do, I'll put you in the trunk." *Id*. at 126. The two then left the duplex at approximately 1:00 a.m. the following morning and went to the residence of Candace Rich ("Rich"), who was the cousin of J.J.'s father and Janet's ex-boyfriend, Sanders. Buehner and Janet stayed at Rich's home until approximately 4:00 a.m.

[7]     At some point between 4:00 a.m. and 5:30 a.m. that morning, Buehner went to the home of Jessica Hudson ("Hudson") and Charles Trice and knocked loudly and quickly at the front door. Hudson opened the door, and Buehner came inside. Buehner had blood on the jeans and white tank top he was wearing. Buehner was "panicking," and tossed a handgun at Hudson. *Id.* at 246. Hudson did not touch the gun and let it fall to the floor. Buehner, panicking and pacing, stated, "I shot 'em. I shot 'em. I shot 'em."[2] *Id*. Hudson was worried that Buehner might be wanted by the police and told him to park behind her home.

---

[2] Hudson clarified that Buehner "didn't say her. He didn't say him. He just said, I shot 'em." *Id*. The word "'em," is an informal variant of the pronoun "them." *See* Merriam-Webster "'em," https://www.merriam-webster.com/dictionary/'em. In informal speech, "them" can be used as a gender-neutral singular pronoun. *See Singular They*, https://www.merriam-webster.com/words-at-play/singular-nonbinary-they; The Chicago Manual of Style Online, § 5.48 "*Singular 'they,'*" http://www.chicagomanualofstyle.org/book/ed17/part2/ch05/psec048.html.

Hudson left the front room for a few minutes, and when she returned, Buehner and his gun were gone.

[8] At approximately 5:30 a.m., Buehner called Kelli Kashon ("Kashon") and told her that he needed to see her. Buehner told Kashon that he and his girlfriend had broken up. Kashon gave Buehner directions to the home where she was staying, and Buehner arrived in a Jeep, wearing jeans and a white tank top, both of which were blood stained. Buehner physically broke his mobile phone, as well as telling Kashon that he had beaten someone up after this person allegedly did not pay Buehner in exchange for prescription pills. Buehner gave Kashon some prescription drugs and handed her a blood-stained wad of cash. The two went to the home of Kashon's friend, Adam Bailey ("Bailey"), where she had stored some of her clothes. Bailey was not at home, and although Kashon had permission to enter the home, she did not have a key. Buehner therefore opened a window, climbed into the house, and opened the front door for Kashon. After having sexual intercourse with Kashon, Buehner fell asleep. Kashon then went out to sell the prescription drugs Buehner had given her.

[9] At some point later in the morning of October 2, 2015, Jessica's daughter and neighbor saw Janet's body lying on the front porch of the duplex where Jessica lived. The neighbor informed Jessica, who went to the front porch, saw her mother's body, and telephoned the police. The police arrived on the scene and observed that Janet had been shot one time in the left side of the head.

[10] In the meantime, Buehner and Kashon had gone to sell prescription drugs at another individual's home. While there, Kashon saw Buehner's photograph on the television news. Kashon, still believing that Buehner had beaten someone up, agreed to go with Buehner to Kentucky to sell more drugs. Kashon drove Buehner to Kentucky in the Jeep Buehner had stolen from Tolliver. During the trip, Kashon asked Buehner about the blood on his clothes, as he was still wearing his blood-stained jeans. Specifically, Kashon asked "how bad did you beat [the] dude up?" Buehner replied, "I didn't beat him up, I shot him." *Id*. at 152.

[11] After they had driven to Kentucky, a local police officer pulled over the Jeep for reckless driving. The officer noted that Buehner, who was in the back seat, was moving around a lot, which concerned the officer. The officer secured Kashon and went to remove Buehner from the back seat. When he did so, he saw that Buehner had removed his jeans and was wearing only his boxer shorts. Buehner initially gave the police a false name, but later admitted that he was Anthony Buehner. The police found Buehner's blood-stained jeans in the back seat. The police arrested the two for driving a stolen vehicle and later learned that Buehner was wanted for murder. A search of Kashon's person revealed the blood-stained money Buehner had given her.

[12] In the meantime, Indianapolis police began to investigate Janet's murder. Autopsy results confirmed that Janet had been killed by a gunshot wound to the left side of her head. The police searched the homes Buehner had visited on the night in question, and they found Buehner's tank top at Bailey's home. Buehner

had apparently attempted to destroy the shirt, as it was partially burned, but it still contained blood stains. Subsequent DNA testing of Buehner's shirt, jeans, shoes, and the money he gave to Kashon revealed that the blood was Janet's. The police also found during their investigation handwritten lyrics, in Buehner's handwriting, on the back of a meal order form from the Marion County Jail. The lyrics are crude, vulgar, and boast of Buehner's sexual accomplishments. The lyrics contain the line, "I almost f\*cked her up over him[.]" Ex. Vol., State's Ex. 36.

[13] On October 6, 2015, the State charged Buehner with Janet's murder. The State subsequently filed a notice of its intent to offer evidence under the exceptions set forth in Indiana Evidence Rule 404(b). The State indicated that it intended to introduce evidence of the following: that Buehner was controlling of Janet and that Janet distanced herself from her daughter after she began her relationship with Buehner; that Buehner verbally threatened to kill Janet; that Buehner put his hands on Janet's neck; that Buehner was jealous of Janet's prior relationship with the father of her youngest son; and that Buehner did not want Janet to attend a family birthday party and threatened to "shoot up" the party if she did attend. Appellant's App. Vol. II, p. 151. The trial court held a hearing on the State's motion on October 19, 2017, and, after hearing testimony from Jessica and subsequent briefing by the parties, the trial court granted the State's motion on November 1, 2017.

[14] A three-day jury trial commenced on April 6, 2018. Immediately before trial, Buehner filed a motion in limine seeking to exclude testimony from Smiley that

Buehner had indicated his desire to kill his girlfriend. The trial court denied the motion. At trial, Buehner objected to Smiley's testimony regarding Buehner's statements, but the trial court overruled the objection and permitted Smiley to testify that Buehner had stated his desire to kill his girlfriend. Buehner also objected to Jessica's testimony regarding her mother's relationship with Buehner, but the trial court also overruled this objection. Buehner objected again when the State offered to introduce the lyrics written by Buehner. The trial court overruled this objection too and permitted the State to offer to the jury a redacted version of the lyrics.[3] At the conclusion of the trial, the jury found Buehner guilty as charged. On May 9, 2018, the trial court sentenced Buehner to sixty-three years of incarceration. Buehner now appeals.

## Discussion and Decision

[15]     Buehner contends that the trial court abused its discretion by admitting evidence that he claims was inadmissible pursuant to Indiana Evidence Rule 404(b). Decisions regarding the admission or exclusion of evidence are left to the sound discretion of the trial court. *Laird v. State*, 103 N.E.3d 1171, 1175 (Ind. Ct. App. 2018), *trans. denied* (citing *Harrison v. State*, 32 N.E.3d 240, 250 (Ind. Ct. App. 2015), *trans. denied*). On appeal, we review the trial court's decision only for an abuse of that discretion. *Id*. The trial court abuses its discretion only if its decision regarding the admission of evidence is clearly

---

[3] The trial court also entered an unredacted copy of the lyrics into the record.

against the logic and effect of the facts and circumstances before it, or if the court has misinterpreted the law. *Id*.

[16] Buehner argues that the trial court abused its discretion in admitting evidence regarding the nature of his relationship with Janet, specifically Jessica's testimony that Buehner was controlling and interfered with Janet's relationship with her daughter, and at least once placed his hands on Janet's neck. He also argues that the evidence regarding his prior threats to kill or injure Janet were improperly admitted, as was the sheet containing the vulgar lyrics. Having reviewed the record before us, we conclude that even if we assume *arguendo* that this evidence was improperly admitted, any error was harmless.

[17] As we set forth in *Harrison*:

> We will not reverse a defendant's conviction if the error was harmless. An error is harmless if substantial independent evidence of guilt satisfies the reviewing court that no substantial likelihood exists that the challenged evidence contributed to the conviction. Generally, errors in the admission of evidence are to be disregarded unless they affect the substantial rights of a party.

32 N.E.3d at 254 (citations omitted).

[18] Buehner claims that the admission of this evidence was not harmless, noting the circumstantial nature of the case against him. We note that, whether or not the evidence was circumstantial, it was overwhelming. Buehner was seen with Janet on the night/early morning of her death. The two were seen arguing over cash that Buehner had given to Janet and that Janet refused to return. Buehner

was seen trying to get rid of a handgun later that morning, and he was covered in blood. Buehner attempted to burn his blood-stained shirt and fled to Kentucky. When he was arrested, he had removed his blood-stained jeans. The woman Buehner was apprehended with, Kashon, was found in possession of cash that was also bloodstained. Subsequent DNA testing of the blood found on Buehner's shirt, jeans, shoes, and the cash revealed that the blood found on these items belonged to Janet. Thus, Buehner was the last person seen with Janet while she was alive, had possession of a handgun, attempted to destroy incriminating evidence, and later fled the state covered in Janet's blood and in possession of the cash over which the two had been arguing. Janet was later found dead from a gunshot wound to the head.

[19] Given the strength of this evidence, we can only conclude that the admission of evidence regarding the nature of Buehner's relationship with Janet, his threats toward her, and the lyrics sheet was harmless. That is, there was independent evidence of guilt such that there was no substantial likelihood that the challenged evidence contributed to the jury's verdict.

[20] Accordingly, we affirm the judgment of the trial court.

Vaidik, C.J., and Crone, J., concur.